## Ex Parte Fletcher Way.

### No. 3863.   Decided December 1, 1915.

**Habeas Corpus—Murder—Bail—Practice on Appeal.**

It is the uniform practice of this court not to discuss the evidence in bail cases, but where the lower court refused to bail and the facts show on appeal that he was entitled to bail the same is granted. Harper, Judge, dissenting.

Appeal from the District Court of Bexar.   Tried below before the Hon. W. S. Anderson.

Appeal from a judgment denying defendant bail upon a charge of murder.

The opinion states the case.

*J. Ed Wilikins* and *T. M. West,* for relator, Fletcher Way.—On the question that bail should have been granted: Ex parte Smith, 23 Texas Crim. App., 100; Ex parte Bridgewill, 57 Miss., 39; Simson v. State, 48 Texas Crim. Rep., 328; Hudson v. State, 59 Texas Crim. Rep., 650; Patillo v. State, 9 Texas Crim. App., 458; Ex parte Stephenson, 71 Texas Crim. Rep., 380, 160 S. W. Rep., 77; Ex parte Burton, 75 Texas

Crim. Rep., 105, 170 S. W. Rep., 308; Ex parte Dooley, 74 Texas Crim. Rep., 650, 170 S. W. Rep., 303.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—This is an appeal from an order refusing to grant relator bail. Relator killed Louis Moglia, Sr., on or about the 15th day of last July.

The facts would show that deceased owned a saloon in San Antonio, and his son, Joe, was his bartender. Relator went into the saloon to get a drink, and did get a drink. He says the drink made him sick, and he called for a "lemon and soda," after drinking which he vomited. He then sat down at a table and went to sleep. He had on a diamond ring, and the bartender's attention was attracted to it, and the bartender sought to buy it, but he refused to sell it because it had been given him by his mother. When relator awoke, after sleeping some two hours, he missed this ring, and without detailing the conversation, it may be said that he created the impression that he believed Joe Moglia, the bartender, had taken the ring while he slept. This Joe Moglia denied, and he and his father ejected relator from the saloon, either striking him with their fist or with an empty beer bottle. It may be said that if the killing had then taken place the issue of manslaughter would be in the case. After relator was ejected from the saloon, he goes to a pawn-shop, purchases a pistol, and returns to the saloon. The time of his absence is fixed by relator at from thirty to forty minutes, while the State's evidence would show it to be about an hour.

The State's case is that when relator returned he entered the saloon and said to Joe Moglia: "Give me my ring, you dago son-of-a-bitch," and fired at Moglia, when deceased rushed at relator and said, "Don't shoot my son, shoot me," and relator proceeded to shoot Louis Moglia, killing him. The relator's testimony is that after he purchased the pistol at the pawn-shop he returned to the saloon, and upon entering the saloon remarked: "I want to look for my ring," when Joe Moglia said, "I will ring you, you son-of-a-bitch," and started towards the end of the counter where a pistol was always kept, and he shot; that Joe ducked down behind the bar, and deceased rushed at him with his hand in his pocket, and said, "Shoot me, you son-of-a-bitch." That he then shot Louis Moglia, firing four times in rapid succession.

The majority of the court think the trial court was in error in not granting bail, they holding that the issues of manslaughter and self-defense are presented with such cogency as to entitle relator to bail. And in accordance with their view the judgment of the trial court is reversed, and relator is granted bail in the sum of $10,000.

The writer, individually, does not think that the issues of manslaughter and self-defense are raised with that strength and cogency that we should hold that the trial court, who saw and heard the witnesses, was in error in refusing bail. It may be that the trial court on the trial should submit manslaughter,—on the ground that if the

blow in ejecting relator caused pain or bloodshed, and relator had not had time to form the intention to kill in a cool and deliberate frame of mind, the relator would only be guilty of manslaughter. Also if relator went back to the saloon with no intention to kill, and all he said was, "I came to look for my ring," when Joe Moglia cursed him, and started towards the end of the counter where a pistol was kept, the court should also submit self-defense, if relator then believed from the acts and conduct of Joe Moglia that his life was in danger. But to the writer's mind, taking the record as a whole, the evidence is slight to raise such issues. The evidence makes it manifest that Joe Moglia did not get relator's ring, although relator at the time may have believed he did get it. And it may be that Joe Moglia and his father used greater force than was necessary in ejecting relator from the saloon after the relator had charged Joe with stealing the ring, all of which would tend to arouse relator's anger. But if he thought Joe Moglia had stolen his ring, he had no legal right to seek to repossess himself of the ring by force. Officers are elected, and courts maintained to right such wrongs, and if relator had applied to the officers of the law to right his wrong, after getting out of the saloon, there would have arisen no necessity for the taking of human life. He does not apply to an officer, but takes the law into his own hands. The shortest period of his absence is fixed at thirty minutes. This, to my mind, is ample cooling time, when there was nothing occurred after leaving the saloon to keep his anger aroused. In this thirty minutes he goes and buys a pistol and returns to the saloon, from which he had been ejected, and where he says he knew Joe Moglia kept a pistol at the end of the counter. When he gets there, according to his testimony when Joe Moglia "started" towards where he kept his gun, he begins to shoot. If Joe Moglia did say, "I will ring you, you son-of-a-bitch," and start towards his pistol, what would any reasonable man expect but that he would do so, when the man who charged him with stealing a ring returned to his place of business.

Certainly the evidence as given by himself does not show, to the writer's mind, that he returned to the saloon on any lawful mission, or that he believed his return would be received in any amicable frame of mind by Joe Moglia and his father, yet he deliberately goes into this saloon, after arming himself, and while there he slays his fellow man.

When our Constitution was framed murder upon express malice was punishable alone by death, and if the proof is evident that a killing took place upon express malice, the case is not bailable under the provisions of the Constitution, and I think under the record before us that the trial court was authorized to find on the evidence adduced that the killing was upon express malice, and so believing I enter this my dissent to the order reversing the judgment of the trial court and granting bond.

*Bail granted.*

PRENDERGAST, PRESIDING JUDGE, and DAVIDSON, JUDGE.—It is the uniform practice not to discuss the evidence in bail cases, such as this, and we will not, and do not, do so in this case. However, we will say we have carefully read the statement of facts, and in our opinion the circumstances and positive evidence are much more favorable to relator than Judge Harper thinks, and under the uniform decisions he is clearly entitled to bail.